1
2
3
4
5
6
7
8
9        UNITED STATES DISTRICT COURT
10       SOUTHERN DISTRICT OF CALIFORNIA
11

| | |
|---|---|
| JANE WHEELER,<br><br>                                    Plaintiff,<br><br>v.<br><br>HOME DEPOT U.S.A., INC.,<br><br>                                    Defendant. | Case No.:  15cv2236-CAB-AGS<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 41] |

        This matter is before this Court on Defendant's motion for summary judgment.  On March 13, 2017, a hearing was held with regard to the motion. [Doc. No. 54.] Erin Hanson, Esq., and Kevin Mirch, Esq. appeared on behalf of Plaintiff Jane Wheeler.  Anthony Sbardellati, Esq. appeared on behalf of Defendant Home Depot.  For the reasons set forth below, the motion is granted.

### I.       General Background

        Plaintiff was employed by Home Depot from 1994 until August 2014. [Deposition of Plaintiff Janet Wheeler [Doc. No. 41-5 ("Wheeler Depo."), 22:16-24:18 and 32:1-25.] During her employment at Home Depot, Plaintiff worked as an assistant store manager ("ASM"), a co-manager and a Store Manager ("SM").  In 2005, Plaintiff was transferred

1

to become the SM of the Chula Vista store, where she remained until 2012. [*Id*., 30:23-31:11.]  In 2012, Plaintiff was transferred to work as the SM of the Otay Mesa store, where she remained until she resigned in 2014. [Doc. No. 41-5, Wheeler Depo., 31:12-32:25, 239:17-240:11; Doc. No. 41-7.]

In the First Amended Complaint ("FAC"), Plaintiff alleges Defendant constructively terminated her by discriminating against her based on age and gender, and retaliated against her for complaining about improper conduct in the workplace.  Defendant seeks summary adjudication of each of the remaining claims in the FAC.[1]

## II.      Statement of Facts

In the last few months of her employment at Home Depot, Plaintiff received two progressive disciplinary notices from her District Operations Manager, Mr. Taylor, and five Manager's Notes from the Human Resources Manager, Ms. Korkow, with regard to poor store operations and appearances.  [Doc. Nos. 41-31, 41-32; Doc. Nos. 41-22 – 41-27.][2]

At 3:49 p.m. on August 25, 2014, Mr. Taylor sent an email to a listserv which included all eleven SMs in District 199 (the "August 25 email"). [Taylor Depo., 47:12-48:6, 119:1-120:23; Wheeler Depo., 227:18-228:19; Doc. No. 41-10.]  In that email, Mr. Taylor wrote that Plaintiff's store had performed poorly over the prior six months and that she was not improving and was "at risk."  [Taylor Dep., 47:12-53:9; Doc. No. 41-10.]  Mr. Taylor testified that he should have sent this email to his boss and [District Manager] Astorino, only, but he accidentally sent it to all the SMs in District 199. [Taylor Depo., 44:19-47:25 and 119:1-120:23.]  As soon as he sent the August 25 email, Mr. Taylor

---

[1] On July 29, 2016, this Court granted Defendant's motion to dismiss the first and second causes of action for fraudulent and negligent misrepresentation.  [Doc. No. 127.]

[2] Defendant argues any events that occurred before June 4, 2014 are barred as a matter of law due to Plaintiff's failure to timely pursue them.  [Doc. No. 41-1 at 20-21.]   Plaintiff does not oppose this argument except to say that a disciplinary notice sent in April 2014 "was used to justify the later discipline notices and Plaintiff's final write-up" and therefore should be included in the analysis.  [Doc. No. 44 at 26-27.]  Even assuming this to be true, Plaintiff fails to state a prima facie case of discrimination or retaliation for the reasons set forth below.

received a call from another SM in District 199 who explained that it was sent to all SMs in the district. [Taylor Depo., 119:1-120:23.] Two minutes after the August 25 email was sent, Mr. Taylor sent another email asking all the SM's to immediately delete the August 25 email.  [Doc. No. 41-11.]  Approximately 14 minutes after sending the second email, Mr. Taylor sent a third email to the SMs, apologizing for any embarrassment and taking responsibility for sending the August 25 email.  [Doc. No. 41-12.]  After sending the emails, Mr. Taylor also called Plaintiff and apologized for sending it.  [Taylor Depo., 119:1-120:23.]  Mr. Taylor was later disciplined by his boss for circulating the August 25 email.  [Astorino Depo, 116:12-118:11; Taylor Depo., 44:19-45:18.]

Upon receipt of the August 25 email, Plaintiff forwarded it to the Human Resources Manager, Ms. Korkow, and requested a meeting to discuss the issue. [Wheeler Depo., 231:13-232:14; Doc. No. 41-13.]  Ms. Korkow responded to Plaintiff that Mr. Taylor sending the August 25 email was a "huge mistake" and asked Plaintiff whether she could meet at a Starbucks on August 28, 2014 at 8:15 a.m. [Wheeler Depo., 234:8-238:12; Doc. No. 41-14.] The following is Plaintiff's testimony with regard to that meeting:

Q. Did you meet her?
A. I did.
Q. When?
A. The next day at 8:15.
Q. And was that –
A. So the 27th.
Q. Maybe the 28th?
A. Oh, yeah, the next day after the 27th.  I'm sorry.  Yes, the 28th.
Q. You met her at 8:15 in the morning?
A. At 8:15 in the morning, at Starbucks inside the Target next to the Balboa Home Depot.
Q. How long did you meet with Courtney [Ms. Korkow]?
A. About 15 minutes, probably.
Q. Do you recall what you discussed?
A. Yes, I told her that – she had asked me, when we had met previously, to not quit and to think about it, to not leave.  And I had told her on that previous occasion that I – I would take some time to think about it, but I didn't think that it would make any

difference because if they had decided to terminate me, they were going to terminate me anyway. One way or another, it was going to happen, so why would I postpone it.

And she asked me if I knew anybody that could hire me, off the record. And, again, asked me to please take a couple of days at least to think about it.

And so this was our follow-up meeting, where I had asked her to bring me a copy of my file, and I let her know that I was for sure not coming back.

Q.   So based on your testimony, it's my understanding that after Alex Taylor sent out that email to the entire team on August 25th that was not supposed to be sent to the entire team, you told Courtney that you felt like you wanted to quit, and then she asked you to take a few days to think about it; is that correct?

A.   What I told her is I couldn't work for this company anymore. I couldn't work with Alex anymore. I couldn't work in a place that people would allow that anymore. And she asked me to think about it for a few days. And this is when I came back and told her that I had made the decision that I was not going to continue to work for Home Depot.

Q.   And prior to this meeting, did Courtney urge you not to quit?

A.   That is a – that is an interesting question, because she – she said , "We don't want you to quit." But when I said that I was going to be fired if I didn't – that this was – there's, you know, no doubt in my mind that there was this target, and that they were going to find things wrong with me.

And I let her know that if I – if somebody told me I had to fire this person, no matter who it was, I could find something wrong. You can find ways to document anybody out of a job if it was a – something that they wanted to do , and therefore, it didn't make sense for me to – to wait.

Her response to that was no longer, "Please don't quit"; her response to that was, "Off the record, do you know anybody that would hire you in retail?"

Q.   Do you think it's possible she asked you that because she was personally concerned about your financial welfare?

A.   I think she was trying to give me a hint that I was right.

Q.   But do you know that for a fact?

A.   I don't know what is inside her head.

Q.   Okay. So it is at least theoretically possible that she was

concerned for you?

A.     But even if she was concerned about me, I – to me, it just validated that she knew that I was right; that this was – that this was a moot point, to go back to work for the company.  Because otherwise, she would have said, "I'm genuinely concerned for you, I will help you.  Let "—"come back to work.  I will be the HR manager that I should be, and I will help support you and get you the training, if that's what is needed, or help you understand what the circumstances are that are causing this.  I will be there and be a partner to you and help you through it."

Instead, she said, "Go find another job."

Q.     Well, let me just ask you generally, because you did say that you were not inside her head.

A.     Uh-huh.

Q.     Isn't it true that you can't possibly know what she actually meant by that statement?

A.     Nobody could.

[Doc. No. 41-5 at 96-99, Wheeler Depo., 235, ll. 2 – 238, ll. 12.]

On August 29, 2014, Plaintiff resigned from her position as the SM of Otay Mesa. [Wheeler Depo., 31:12-32:25 and 239:17-240:11; Doc. No. 41-7.] According to Plaintiff, "I would have retired from Home Depot. But they . . . made that impossible for me . . . and if I had not left when I did leave, I was going to be terminated anyway, guaranteed." [Wheeler Depo., 259:5-260:7]. When asked how she knew that she would be terminated if she did not resign, Plaintiff testified as follows:

Q.     How do you know that?

A.     Because that last email from Alex was heading me in that direction. And the comment that Courtney made about finding another job.  It was going to happen.  They knew that they – anybody can get fired.  Anybody can find – they can fire you.  And they make it really clear that that's where they are going.

Q.     Isn't it at least possible that you would have survived the final warning?

A.     Again, anything is possible.  I can't read into the future.  But I'll tell you, that was not their plan.

[Doc. No. 41-5 at 115, Wheeler Depo., 260: 9-19.]

Other witnesses testified that when an employee is placed on a final warning, there are several potential outcomes, including termination, but only if performance does not

5

improve. [Astorino Depo., 70:22-71:4; Grooms Depo., 22:18-23:5]. However, if an employee's performance does improve that employee can maintain her employment with the company. [*see Id*. and Taylor Depo.,76:23-78:19].

Finally, Plaintiff's testimony with regard to when she made her decision to quit her job at Home Depot is as follows:

> Q.     When did you make the decision to quit your job at Home Depot?
> A.     The final straw was when I got the email.
> Q.     And –
> A.     And I had – before that, I would say probably – I'm going to say it's been – probably about a month before that, I had started taking some of my stuff home. But that was the straw that broke the camel's back. That was when I decided then, "I've got to go."
>
> I had asked for help, and felt like I was getting nowhere with that. And that's when I had started little by little taking some of my personal effects out of my office and taking them home with me.
>
> So I think, in reality, in my mind, it had been for a while; enough so that I was taking things home. But I – but it was nothing that I had to have at work, so the decision hadn't been really made, you know, concrete until that day. That date was sealed.
> Q.     And just to have a clear record, when you say "that day," and "that email," that was the straw that broke the camel's back, you're referring to the email sent on August –
> A.     On the 27th – 5th – whatever it was. 25th.
> Q.     August 25th, 2014?
> A.     Correct.

[Doc. No. 41-5 at 99-100, Wheeler Depo., 238:14 – 239:14.]

## III.   Legal Standards on Motions for Summary Judgment

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To avoid summary judgment, disputes must be both 1) material, meaning concerning facts that are

relevant and necessary and that might affect the outcome of the action under governing law, and 2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (citing *Anderson*, 477 U.S. at 248).

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *See Celotex Corp.*, 477 U.S. at 322-323.  If the moving party can demonstrate that its opponent has not made a sufficient showing on an essential element of his case, the burden shifts to the opposing party to set forth facts showing that a genuine issue of disputed fact remains.  *Id.* at 324.  When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[3]

## IV.    Discussion

### A.    Fair Employment and Housing Act ("FEHA") Claims

#### 1.  Prima Facie Discrimination or Retaliation

"California applies the *McDonnell Douglas* burden-shifting framework and other federal employment law principles when interpreting the FEHA."  *Schechner v. KPIX-TV*, 686 F.3d 1018, 1023 (9th Cir. 2012); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  As the Ninth Circuit has explained:

> The *McDonnell Douglas* analysis imposes on the plaintiff an initial burden of establishing a prima facie case of discrimination.  To establish a prima facie case, a plaintiff must offer evidence that gives rise to an inference of unlawful discrimination.  The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas*, or by more direct evidence of discriminatory intent.  The requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment

---

[3] In the reply, Defendant objects to the Declaration of Amapola Martin.  [Doc. No. 49 at 2-3.]  The declaration is not pertinent to the issue of whether Plaintiff was constructively discharged, and therefore was not considered.  Accordingly, Defendant's objection is denied as moot.

is minimal and does not even need to rise to the level of a preponderance of the evidence.

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (internal quotation marks, brackets, ellipses and citations omitted). "While the plaintiff's prima facie burden is not onerous, he must at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355 (2000)(internal quotation marks and citations omitted). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory or retaliatory reason for the adverse employment action. *Id.* If the employer satisfies this burden, the burden shifts back to the plaintiff to prove discrimination or retaliation. *Id.* at 356.

The FAC asserts four FEHA claims: (a) Claim Three for Retaliation; (b) Claim Four for Failure to Prevent Discrimination and Retaliation; (c) Claim Five for Age Discrimination and (d) Claim Six for Gender Discrimination.

### *Claim Five – Age Discrimination*

To make a prima facie age discrimination case under FEHA, Plaintiff must show (1) she was at least 40 years old; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) evidence, such as replacement by a significantly younger employee with similar or inferior qualifications, suggests a discriminatory motive for the employment action. *Guz*, 24 Cal. 4th at 355; see also *Diaz v. Eagle Produce Ltd. P'ship.*, 521 F.3d 1201, 1207 (9th Cir. 2008) ("Generally, an employee can satisfy the last element of the prima facie case only by providing evidence that he or she was replaced by a substantially younger employee with equal or inferior qualifications"). "While the plaintiff's prima facie burden is not onerous..., [s]he must at least show actions taken by the employer from which one can infer, if such actions remained unexplained, that it is more likely than not that such actions were based on a [prohibited] discriminatory criterion [.]" *Guz*, 24 Cal. 4th at 355 (internal quotation marks and citations omitted).

Here, the first prong is satisfied because it is undisputed that Plaintiff is over the age of 40; she was 52 years old when she resigned from Home Depot. [Doc. No. 44-2 at ¶2.] As to the fourth prong, there is evidence that Plaintiff's replacement, Richard Tim, is "late 30s, early 40s, somewhere around there." [Doc. No. 42, Astorino Depo., Ex. 25, p. 216; Doc. No. 44-26 at 62, ll. 4-8.] There is also evidence that Tim had previously been a co-manager at another Home Depot store. [Doc. No. 44-26 at 66, ll. 16-19.] Thus Plaintiff established a genuine issue as whether she was "replaced by a substantially younger employee with equal or inferior qualifications." *Hersant v. Dept. of Soc. Serv.*, 57 Cal.App.4th 997, 1002-1003 (1997).

Plaintiff also established a genuine issue as to whether she was performing her job in a satisfactory manner. *Id.* Defendant provided evidence that Plaintiff had been given several disciplinary notices from her District Manager and Human Resources in the months prior to her resignation with regard to various performance issues primarily related to store appearance and operations. [Doc. Nos. 41-31, 41-32; Doc. Nos. 41-22 – 41-27.] However Plaintiff submitted evidence that, five days prior to her departure, she received a positive evaluation in similar categories from a different (asset protection) manager. [Doc. No. 44-16.] In the last year of her employment, Plaintiff was also in the top five stores in her district and received a bonus based on her store's performance. [Doc. No. 44-15.] Therefore, Plaintiff established a genuine issue as to whether she was performing her job satisfactorily.

However, Plaintiff fails to establish a genuine issue that an adverse employment action was taken against her. Defendant has submitted evidence that Plaintiff voluntarily resigned from her employment. In the briefing, Plaintiff argued that a series of events, culminating in the August 25 email, were adverse employment actions. [Doc. No. 44 at 22-23.] At oral argument, Plaintiff's counsel argued that Plaintiff resigned because of the contents of the August 25 email and a later discussion with Human Resources where she was essentially given an "ultimatum."

"Constructive discharge, like actual discharge, is a materially adverse employment

action." *Steele v. Youthful Offender Parole Bd.*, 162 Cal.App.4th 1241, 1253, quoting *EEOC v. Univ. of Chicago Hospitals*, 276 F.3d 326, 331–332 (7th Cir. 2002). "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation. [Citation.]" *Turner v. Anheuser–Busch*, 7 Cal.4th 1238, 1244–1245 (1994). "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004)). Courts "set the bar high for a claim of constructive discharge because . . . antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable.'" *Id.*

A "constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'" *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (quoting *Turner*, 7 Cal. 4th at 1246). There are "'three areas of inquiry' to test whether a constructive discharge claim can be proved": (1) whether there were intolerable conditions; (2) "whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit"; and (3) whether the employee's resignation was "*employer*-coerced, not caused by the voluntary action of the employee or by conditions or matters beyond the employer's reasonable control." *Casenas v. Fujisawa*

*USA, Inc.*, 58 Cal. App. 4th 101, 113-14 (Cal. Ct. App. 1997) (quoting *Turner*, 7 Cal. 4th. at 1246, 1248) (*italics* in original; internal quotation marks and citations omitted).  In sum, "to establish a constructive discharge, an employee must plead and prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." *Turner*, 7 Cal. 4th at 1251.

"Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury." *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996)).  However, "an employee cannot simply 'quit and sue,' claiming he or she was constructively discharged.'" *King v. AC & R Advert.*, 65 F.3d 764, 767 (9th Cir. 1995) (quoting *Turner, Inc.*, 7 Cal. 4th at 1246). "In such instances, summary judgment is appropriate."  *Id.*; *see also Scotch v. Art Inst. of California-Orange Cty., Inc.*, 173 Cal. App. 4th 986, 1022 (Cal. Ct. App. 2009) ("[S]ummary judgment against an employee on a constructive discharge claim is appropriate when, under the undisputed facts, the decision to resign was unreasonable as a matter of law.").

In the briefing, Plaintiff first argues that the following were adverse employment actions:

> . . . the July 31, 2014 counseling, the manager's notes, the August 25, 2014 email, the District Operations Manager sending admittedly sensitive and private performance discipline information to Plaintiff's peers, and the final writeup that Taylor confirmed Wheeler would receive, *see* Ex. 1. Astorino testified that Taylor would have had access to the disciplinary information contained in the August 25th email, and he doesn't believe Taylor fabricated the fact that Wheeler was being put on a final. *See* Astorino Depo. 118:5-119:15.

[Doc. No. 44 at 22.]

The counseling, manager's notes, and August 25 email do not constitute

adverse employment actions even if, as Plaintiff argues, those disciplinary notices were unfair and instigated by a discriminatory animus. Being given poor performance reviews or disciplinary notices are not the sort of extraordinary and egregious conditions that would justify a constructive discharge claim.

Plaintiff confuses alleged discrimination with harassment and the heightened requirements for intolerable conditions. Whether Plaintiff was a victim of discrimination does not automatically indicate that conditions were so intolerable that she was forced to resign. As one California court explained in the context of a hostile work environment claim (which is a lower standard than the intolerable conditions required for constructive discharge), "harassment consists of a type of conduct not necessary for performance of a supervisory job. Instead, harassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives. Harassment is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job." *Janken v. GM Hughes Elec.*, 46 Cal. App. 4th 55, 63 (Cal. Ct. App. 1996). "[C]ommonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment." *Id.* at 64-65. "Discrimination claims, by contrast, arise out of the performance of necessary personnel management duties." *Id.* at 63.

Here, Plaintiff argues that she is the victim of discrimination, but whether Home Depot engaged in discrimination is a separate question from whether it created working conditions so intolerable that Plaintiff had to resign. In that regard, Plaintiff offers no evidence that Home Depot changed Plaintiff's working conditions or made it difficult for her to perform her job functions. In fact, after the August 25 email

event, Mr. Taylor and Ms. Korkow apologized and tried to rectify the sending of the email. There is no evidence Plaintiff was harassed[4] or subjected to epithets and scorn.[5]   Rather, the only evidence is that Plaintiff was subject to numerous disciplinary actions that are part of employee supervision. Even if these disciplinary actions were falsely or unfairly inflicted upon Plaintiff in a discriminatory fashion, they do not create the intolerable conditions necessary to hold that Plaintiff's resignation was in fact a constructive discharge.

Moreover, Plaintiff misstates the evidence when she argues that Taylor "confirmed Wheeler would receive" a final write-up, and cites to the August 25 email. [Doc. No. 44 at 22.] The August 25 email does not confirm that Plaintiff would be given a final write-up. Rather, it is an internal document (not meant to be seen by Plaintiff) where Mr. Taylor relays to his supervisor that Plaintiff was "at risk." Thus, it does not constitute a final write-up. Moreover, Mr. Taylor did not have authority to put Plaintiff on a final write-up. [Doc. No. 44-27 at 7, Taylor

---

[4] It is noteworthy that Plaintiff has not brought a claim for harassment, as the conditions identified by Plaintiff are not even sufficient to maintain a hostile work environment claim, which is a lower standard than what must be shown for constructive discharge. *Brooks*, 229 F.3d at 930 ("Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job."); *see also Pennsylvania State Police v. Suders*, 542 U.S. 129, 133 (2004) (holding that to establish constructive discharge, a plaintiff must make a further showing beyond that required to establish a hostile work environment: "that the abusive working environment became so intolerable that her resignation qualified as a fitting response.").

[5] Plaintiff testified as to various comments that were made to her concerning personal issues, such as a death in her family, along the lines of "Wow, you're having a bad year." (Plaintiff Dep., 243:6-246:10 and 248:6-25) However, she testified that she never heard her supervisors make any comments specifically related to her age. (*Id*., 243:6-246:10 and 248:6-25). She was also teased by a few coworkers while they played on a company softball team. (*Id*., 253:11-254:12 and 255:16-256:11). Finally, Plaintiff testified that Mr. Taylor spoke to her in a condescending tone. (Plaintiff Dep., 162:1-7 and 175:4-180:19) However, Plaintiff admitted that she felt Mr. Taylor was a "jerk" to some men too, and that she did not have many interactions with him. (*Id*., 162:1-7 and 175:4-180:19). None of these events rise to the level of harassment, much less "intolerable conditions."

Depo., 23:1-4.]  That authority was with Mr. Astorino, who testified as follows:

> Q.      Do you have any reason to believe that Mr. Taylor would have been not – would have been fabricating the fact that Ms. Wheeler was going to be put on a final?
>
> A.      So I just want to be clear; I don't think I ever saw the email that you're referring to, so I can't really speak to what he said or didn't say because I never saw it.  Do I think he would fabricate, no.
>
> Q.      So, in your professional relationship with Mr. Taylor, if he said that Ms. Wheeler is going to be put on a final, she was going to be put on a final?
>
> A.      If he – I want to be clear.  He in his mind may have thought she was going to be put on a final.  I don't know where his mind was.  What I am saying to you is, I don't know where I was in the process at that point, if I had agreed to it or not.
>
> Q.      Okay.
>
> A.      I may have.  I may not have.  I don't recall.

[Doc. No. 44-26 at 64.]

Thus, there is no evidence, other than Plaintiff's subjective belief, that she had been placed on a final write-up.  Moreover, even if she had been placed on a final write-up, disciplinary notices, in and of themselves, cannot be adverse employment actions.  As argued by Defendant, if this were so, then no employer would be able to discipline or document poor performance without being at risk of a constructive discharge claim.

Second, in the briefing, Plaintiff argues that failure to receive a mid-year bonus was an adverse employment action.  [Doc. No. 44 at 22.]  According to Plaintiff, if an employee is on a final write-up, then the employee is not eligible to receive a mid-year bonus, which in her case could have been as much as $20,000.  [Doc. No. 44 at 22.]  This failure to receive a mid-year bonus, argues Plaintiff, is an adverse employment action.  *Id.*  However, as discussed above, at the time of her resignation, Plaintiff had not yet been placed on a final write-up.  Moreover, mid-year bonuses are not paid until September.  [Doc. No. 44-2 at ¶44.]  Thus, by resigning in August 2014, Plaintiff made it impossible for her to receive a bonus in September.  Therefore neither the final write-up (which had not yet happened), nor

the mid-year bonus (which was not yet due) are adverse employment actions because they had not occurred prior to Plaintiff's resignation. Plaintiff provides no authority for the proposition that Plaintiff's subjective anticipation of an adverse employment action is sufficient.

Third, in the briefing, Plaintiff argues that "the action of sending the August 25 email to Plaintiff's peers was an adverse employment action, it negatively affected Plaintiff's work conditions because she was suddenly receiving judgment by her peers and her reputation was negatively impacted." [Doc. No. 44 at 22.] According to Plaintiff, after the August 25 email was sent to other Store Managers, she had no choice but to resign, notwithstanding the fact that Mr. Taylor and Ms. Korkow both apologized to her. While the August 25 email event may have been embarrassing for Plaintiff, it was an isolated instance that does not rise to the level of intolerable conditions. See *Turner*, 7 Cal.4th at 1246 (single or isolated acts are generally insufficient to support a constructive discharge claim). Moreover, Mr. Taylor tried to rectify the situation by asking the other Store Managers to delete the email and apologizing to Plaintiff. Ms. Korkow also apologized to Plaintiff, letting her know that it was a mistake. In essence, once put on notice of the transmission of the August 25 email, Defendant took reasonable steps to remedy the situation. *See Cesenas v. Fujisawa USA, Inc.*, 58 Cal.App.4th 101, 118 (1997)(employer's timely response to employee's complaint and reasonable efforts to remedy the situation tend to show that employer did not knowingly permit the [allegedly intolerable] conditions to exist). Therefore, this isolated incident which Defendant took reasonable steps to remedy does not constitute an "intolerable condition" to justify Plaintiff's decision to resign. *Turner*, 7 Cal.4th at 1246.

At oral argument, Plaintiff's counsel presented a new theory that Plaintiff did not resign merely because an email was sent to her peers; rather, Plaintiff resigned because of the "contents" of the email and a later discussion with her Human Resources Manager where she was given an "ultimatum." First, as to the contents

of the email stating that Plaintiff was "at risk," this was an internal document discussing a series of disciplinary actions. As discussed above, even if those disciplinary actions were motivated by a discriminatory animus, they do not constitute "intolerable conditions" that would support a constructive termination claim.

Second, at oral argument, Plaintiff's counsel characterized Plaintiff's discussion with Ms. Korkow at Starbucks on August 28 (the "Starbucks meeting") as Ms. Korkow giving Plaintiff an "ultimatum" that she needed to "go find another job" or she would be fired. However, this is a mischaracterization of the evidence. As the testimony discussed above makes clear, prior to the August 25 email, Plaintiff had discussions with Ms. Korkow about wanting to quit because she believed Mr. Taylor wanted to fire her. [Wheeler Depo., 235:16 – 24.] After Plaintiff told Ms. Korkow she wanted to quit, Ms. Korkow said "off the record, do you know anybody that would hire you in retail?" [Wheeler Depo., 235:25 – 236: 1; 237: 8 -10.] Later in Plaintiff's testimony, when Plaintiff referred back to that conversation, she characterized Ms. Korkow's statement as "Go find another job." [Wheeler Depo., 237:18 – 238: 6.] Plaintiff admitted, however, that she did not know what Ms. Korkow meant by that statement. [Wheeler Depo., 238:10-12.] Finally, Plaintiff never testified that Ms. Korkow ever said anything to the effect of "you will be fired." Therefore, Plaintiff's counsel's attempt to characterize this conversation as an "ultimatum" is a vast distortion of the actual testimony.

Regardless of what Ms. Korkow said to Plaintiff after the August 25 email, Plaintiff was very clear in her testimony that she had made the decision to quit the day the August 25 email was sent. [Wheeler Depo., 238:14 – 239:14.] Plaintiff had been thinking about quitting for one month prior to that date, and had even taken some of her personal items home. [Wheeler Depo., 238:17 – 239: 7.] But when the August 25 email was sent, Plaintiff testified, that was "the straw that broke the camel's back." [Wheeler Depo., 238:21 – 23.] "That date [the decision to quit] was

16

sealed." [Wheeler Depo., 239: 7.]   Thus, Plaintiff's counsel's attempt at oral argument to de-emphasize the importance of the August 25 email and argue that Ms. Korkow had given Plaintiff some sort of ultimatum at the Starbucks meeting is disingenuous at best.   In fact, Plaintiff testified that the Starbucks meeting was a follow-up meeting to previous discussions where Ms. Korkow had asked Plaintiff to take a couple of days to think about whether she was going to quit.  [Wheeler Depo., 235: 16 – 236: 5.]  Plaintiff further testified that she asked Ms. Korkow to bring a copy of her file to the Starbucks meeting, where Plaintiff "let [Korkow] know that [she] was for sure not coming back." [Wheeler Depo., 236:3 – 6.]  Thus, the evidence is undisputed that Plaintiff had made up her mind to quit on August 25, and the August 28 Starbucks meeting was simply for Plaintiff to convey her decision to Ms. Korkow and obtain a copy of her file.  Therefore, anything Ms. Korkow may have said to Plaintiff at the Starbucks meeting is not a material fact with regard to Plaintiff's decision, made days earlier, to quit her employment at Home Depot.

Finally, even if Ms. Korkow had said something along the lines of "go get another job or you will be fired," that is not an ultimatum that would support a constructive discharge claim.   In the Ninth Circuit, "[i]n some circumstances, a single intolerable incident, such as ... an employer's ultimatum that an employee commit a crime, may constitute a constructive discharge." *Turner*, 7 Cal. 4th at 1247 n.3; *see also Jacobs v. Universal Dev. Corp*., 53 Cal. App. 4th 692, 698–702 (1997) (noting that an employer cannot "demand that the employee commit a criminal act"). Here, there is no allegation or evidence that Plaintiff was ever asked to commit a crime.[6]

---

[6] To support the new "ultimatum" theory, Plaintiff's counsel cited to the following cases, none of which are in the Ninth Circuit:  *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997); *Burkes v. Oklahoma Pub. Co.*, 81 F.3d 975, 978 (10th Cir. 1996); and *Jenkins v. State of Louisiana*, 874 F.2d 992, 996 (5th Cir. 1989).  However, even under the cases cited by Plaintiff, the alleged discussions with Ms. Korkow did not constitute an ultimatum that would support a constructive discharge claim.   In *Faruki*, a genuine issue was established as to discharge where the employer told the plaintiff that he "would be

Plaintiff may have been unhappy with the conditions at Home Depot and they may have caused her stress, but "an employer is not obligated to provide a stress-free environment." *Casenas*, 58 Cal. App. 4th at 113; *see also Turner*, 7 Cal. 4th at 1247 (holding that an employee is not "guaranteed a working environment free from stress") (internal quotation marks and citation omitted). "The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." *Turner*, 7 Cal. 4th at 1246. While the August 25 email event may have been embarrassing and even stressful for Plaintiff, it was not an intolerable condition that would justify Plaintiff being able to "quit and sue." *Turner, Inc.*, 7 Cal. 4th at 1246. Plaintiff has failed to demonstrate that she experienced an adverse employment action, which is a necessary element of her claim. Accordingly, Defendant's motion for summary adjudication as to age discrimination is granted.

### Claim Six – Gender Discrimination

Plaintiff claims that she was terminated because of her gender. In evaluating discrimination claims under FEHA, California courts look to federal precedent governing analogous federal discrimination laws. See *Guz v. Bechtel Nat'l Inc.*, 24 Cal.4th 317, 354 (2000). When responding to a summary judgment motion, the plaintiff may proceed by

---

unable to retain him, and that he had one week before he would be placed on indefinite leave." 123 F.3d at 319. This was evidence of an actual discharge that was merely being postponed by a week. Here, there is no evidence that Plaintiff had even been placed on a final write-up, much less discharged. In *Burks*, the court found that when an employer failed to respond when plaintiff asked about her future with the department, and did not authorize an expenditure for new business cards, this evidence did not support a constructive discharge claim. 81 F.3d at 978. Here, Plaintiff had subjective beliefs that she was going to be fired, but has no evidence that she was on a final write-up, much less fired. Finally, in *Jenkins*, the trial court properly found plaintiff voluntarily resigned after the employer recommended that he be terminated for falsifying medical excuses. 874 F.2d at 996. Similarly, here, Defendant had (rightly or wrongly) disciplined Plaintiff for poor performance. But that does not equate to Plaintiff being given an ultimatum. Therefore, neither the non-binding case law nor the facts support Plaintiff's counsel's argument that Plaintiff was given an ultimatum and was forced to resign.

using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or alternatively, may simply produce direct or circumstantial evidence demonstrating that "a discriminatory reason more likely than not motivated" the employment decision. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).

To make a prima facie case for gender discrimination, plaintiff must show she was a member of a protected class, was competently performing in the position held, suffered an adverse employment action, and the action occurred under circumstances suggesting a discriminatory motive. *McDonnell Douglas Corp.*, 411 U.S. at 80, fn. 13.

Here, is undisputed that Plaintiff is a member of a protected class (female). For the reasons set forth above, Plaintiff presented a genuine issue as to whether she was performing competently. In addition, Plaintiff also established a genuine issue as to discriminatory motive because she was replaced by a male. *See Sandell v. Taylor-Listug, Inc.* 188 Cal.App.4th 297, 323 (2010)(plaintiff must show that position ultimately was filled by someone not a member of the protected class). However, for the reasons set forth above, Plaintiff has not provided evidence to show that she suffered an adverse employment action. Therefore, Plaintiff fails to provide evidence to support a prima facie case of gender discrimination. Accordingly, Defendant's motion for summary adjudication as to gender discrimination is granted.[7]

### Claim Three – Retaliation

"FEHA makes it unlawful for an employer 'to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any

---

[7] In addition, Defendant's motion for adjudication as to any claim for gender discrimination under the Unruh Civil Rights Act (Cal. Civil code §51) is granted. In the context of an action by an employee against an employer, the "California Supreme Court has expressly held that employment discrimination claims are excluded from § 51 's protection." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1124 (9th Cir.2008) (en banc) (citing *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal.3d 493, 500 (1970)). Plaintiff's Unruh Act claim against Defendant fails as a matter of law.

proceeding under this part.'" *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1243 (9th Cir. 2013) (quoting Cal. Gov't Code § 12940(h)).  California courts apply the *McDonnell Douglas* framework to retaliation claims.  *Id.*  "[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005); *see also Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  For the reasons set forth above, Plaintiff has failed to show an adverse employment action.  Accordingly, Defendant's motion for summary adjudication as to the retaliation claim is granted.

### Claim Four – Failure to Prevent Discrimination

FEHA makes it unlawful "for an employer...to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring" in the workplace. Cal. Gov't Code § 12940(k). "When a plaintiff seeks to recover damages based on a claim of failure to prevent discrimination or harassment she must show three essential elements: 1) plaintiff was subjected to discrimination, harassment or retaliation; 2) defendant failed to take all reasonable steps to prevent discrimination, harassment or retaliation; and 3) this failure caused plaintiff to suffer injury, damage, loss or harm." *Leland v. City and Cty. of San Francisco*, 576 F.Supp.2d 1079, 1103 (N.D.Cal.2008).

For the reasons set forth above, Plaintiff has failed to establish a prima facie case as to discrimination or retaliation.  Therefore, Plaintiff fails to establish a claim for failure to prevent discrimination.  Accordingly, Defendant's motion for summary adjudication of this claim is granted.

### B.   Common Law Wrongful Termination Claim

To establish a constructive discharge claim, plaintiff must show that "the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of [plaintiff's] resignation that a reasonable employer would realize that a reasonable person in [plaintiff's] position would be compelled to

resign." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1251 (1994). "To be 'intolerable' or 'aggravated,' [plaintiff's] working conditions must be 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve ... her employer.' " *Id*. at 1246. "The standard by which a constructive discharge is determined is an objective one––the question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' " *Id*. at 1248 (quoting *Rochlis v. Walt Disney Co*., 19 Cal. App. 4th 201, 212 (1993)). If plaintiff establishes a constructive discharge, she then needs to show there is a nexus between the alleged gender discrimination and adverse treatment by defendants. *Turner*, 7 Cal. 4th at 1258.

For the reasons set forth above with regard to age and gender discrimination, Plaintiff has failed to provide evidence of "intolerable conditions." *Turner*, 7 Cal.4th at 1251. Therefore, Defendant's motion for summary adjudication of the wrongful termination claim is granted.

### C.   Defamation

Defamation involves the intentional publication of a statement of fact that is (1) false, (2) unprivileged, and; (3) has a natural tendency to injure or cause special damage. *Smith v. Maldonado*, 72 Cal. App 4th 637, 645 (1999). Under California law, "defamation consists of either libel or slander; 'slander' is false and unprivileged publication, orally uttered, which tends directly to injure person in respect to his office, profession, trade or business, by imputing to him general disqualifications in those respects which office or other occupation peculiarly requires." *Lee v. Eden Medical Center*, 690 F. Supp. 2d 1011, 1023 (N.D. Cal. 2010) (citing Cal. Civ. Code § 46). In a motion for summary judgment on a defamation claim, plaintiff bears a heavy burden to show a triable issue of fact, as summary judgment is a favored remedy in defamation cases. *Couch v. San Juan Unified School District*, 33 Cal. App 4th 1491, 1498-99. A plaintiff alleging defamation must identify the person who made the statement at issue, and to whom it was made. CACI

(2016) Nos. 1704 and 1705; *Matson v. Dvorak*, 40 Cal.App.4th 539, 549 (1995)(to be actionable, the publication must in fact be made by the defendant).

In the FAC, Plaintiff alleges that Mr. Taylor made a statement to Mr. Martinez, a Home Depot vendor, and other Home Depot employees, that Plaintiff was terminated for poor performance. [Doc. No. 17 at 14.]  However, during her deposition, Plaintiff admitted she did not know who told Mr. Martinez that she was terminated for poor performance. [Doc. No. 41-5, Wheeler Depo. 283:5 – 287:19.] Plaintiff also acknowledged that the other Home Depot employees referred to in her complaint, were just "the rumor mill." [Doc. No. 41-5, Wheeler Depo. 285:7 - 20.] Plaintiff also has no knowledge of the manner in which Mr. Martinez found out this information, nor did she know when he found it out. [Doc. No. 41-5, Wheeler Depo. 283:19 – 285:6.]  Moreover, Plaintiff does not know exactly what Mr. Martinez was told, except that she was let go and that it had to do with poor performance. *Id.*  Plaintiff's lack of evidence to show who made the statement, and to whom it was made is fatal to this claim.[8]  Accordingly, Defendant's motion for summary adjudication of the claim for defamation is granted.

## V.   Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**.  Judgment shall be entered for Defendant and the Clerk of the Court shall **CLOSE** the case.  It is **SO ORDERED**.

Dated:  March 22, 2017

_____
Hon. Cathy Ann Bencivengo
United States District Judge

---

[8] In the briefing, Plaintiff cites to various testimony, but none of it supports the allegations in the defamation claim.  [Doc. No. 44 at 17-18.]  At oral argument, Plaintiff's counsel claimed that a statement made by Mr. Astorino that he "did not know" why Plaintiff left Home Depot was defamatory. However, that is not what is alleged in the FAC, and Plaintiff has not asked for leave to amend.  In addition, Plaintiff provides no authority for her proposition that Mr. Astorino allegedly saying "I don't know" is defamation "by omission."